Case number 17, 0553 Maureen Oberlein v. Northwestern Memorial Hospital. We did call the last case that we have set for orals. Do you want to recall us? This is Obermeier v. Northwestern Foundation, Edwards Life Science. For the attorneys that are going to be presenting oral argument, first take your places. Okay. Okay. Okay.  All right. Would all of the attorneys that are going to present oral argument in this case step up to the podium and identify yourselves for the record? All right. Ardwin Boyer for the plaintiff, Maureen Obermeier. Mr. Boyer, good morning. David Jensen for Appley, Edwards Life Sciences. Mr. Jensen. Good morning, Your Honors. Jason Parson on behalf of Appley's Northwestern Memorial Hospital, Northwestern Medical Faculty Foundation, and Dr. McCarty. All right, Mr. Parsons. Good morning to all of you. All right. Now, there are some, as far as the two representing the Appley's, is there going to be some, have you discussed, you know, any overlap or? We have. All right. I believe we've agreed that it's our understanding we have 15 minutes to split between the two of you. Well, we're going to give you 20 since there's two of you, and we're also going to give Mr. Boyer 20 minutes approximately. You don't have to take that. I'm just saying that we're going to permit that. 20 if you need it all, only if you need it all. And you two will split that, correct? Correct, we will. All right. And, Mr. Boyer, you'll have time for your bottle, but you've got to take it out of that total time frame. All right? Okay, thank you. And then we will let Mr. Boyer now step up to the podium. And there are multiple issues. If you're going to focus on a few, could you let us know so that we know what? There are quite a few in the place. I am going to try, yes, Your Honor. All right. You know, try to focus on your most significant ones if you could. Yes, I will. All right. May it please the Court, that said, Your Honor, I would like to start with a few comments on the summary judgment order entered as to, in favor of Edwards, as to Count 3, which is the negligence-informed consent claim. And I'm going to start there because I really think it touches on all of the substantive issues in the case and kind of brings us full circles. There were subcomponents to Count 3, and the ones we pursued, I will just say, are subparagraphs A, D, E, and F, where, essentially, we claimed that Edwards had a duty to give information, as a product manufacturer, to provide information and a warning that the medical device here, the Mixel ring, was not properly approved or approved by the FDA or cleared by the FDA. And its responsibility was to provide that information under the learned intermediary doctrine to provide it to the hospital and to the doctor, and that they failed to do that. We also claim in Count 3 that the ring had some unique features. It was a new ring, and it was different than any other ring ever brought to market. No one from the FDA was ever called in this case. Is that right? Not during a relevant time period. And I'll touch on that. It was not only not called, it was not registered. There's an affirmative obligation under the Medical Device Act regulations, when a new product comes to market, for a manufacturer to register it with the FDA, so that the FDA knows it exists. In this case, at the time, the relevant time from 06 through 07, which is when Dr. McCarthy did his study and the paper was done, using this on patients and sending the results of the study back to Edwards. And, by the way, the product was still in development. Is it true in this case that the evidence that was presented as to whether the McCarthy ring caused the problem, that that wasn't clearly bound to be the problem? As to Count 3, we're talking about the summary judgment stage. And we prevailed on proximate cause at summary judgment. I would ask Your Honor to keep in mind that summary judgment motions were brought by both the Northwestern defendants and Edwards. But my question was that there was evidence on both sides as to whether this caused the problem or not. There was a question of fact. There was evidence on both sides that was absolutely a question of fact. This was the problem. Yes. But that was resolved at a trial, was it not? Well, it was resolved at the trial as to Dr. McCarthy's informed consent claim. Okay? We have a different standard when we're looking at summary judgment. We never got to trial. So we never know what the jury would have decided as to Edwards and whether Edwards' conduct caused or contributed to the outcome here. And you're saying there was really no evidence presented to that jury regarding this issue? Or are you just saying it wasn't presented against Edwards? It wasn't presented against Edwards. Does the case law say that if it's presented to the jury and it's against you, that by estoppel, by verdict, you've lost that issue? Well, I know Edwards raised that argument, but estoppel by verdict requires similarity of issues. And you're saying there's no similarity of issues? Well, there's no similarity of issues. I mean, if you have three ñ Illinois recognizes that there can be multiple causes. And if the conduct of Party A is found not to be a cause or a contributing cause, that says nothing about whether Party B or Party C or Party D's conduct can also be a contributing cause. But going back to Justice Gordon's question, wasn't the testimony really from everyone that the device itself did not contribute or cause an injury to your client? It was maybe a surgical stitch or something else, but no one testified that this caused any harm? No, that was not the testimony. I mean, the testimony was that the ring and the surgical techniques associated with the ring were a causative factor. This was a newly shaped ring. It was larger than customary rings. And we're talking about an orifice, an annulus here, and you put a larger ring in it and stitch around it. It expands the size of the annulus. But your evidence that this was a cause was by an expert witness who was not a surgeon. Isn't that correct? You're talking about Dr. Rajamanan, who is a world-renowned heart valve biologist. A world-renowned. But somebody who has never operated even on a cat. She was not a surgeon, but she was a world-renowned heart valve biologist who knew, who, by the way, was a co-author. I mean, you were suing a legend here. Would you agree? This man is a legend in the heart business, is a heart surgeon. You were suing the legend, and your expert was a biologist. A heart valve biologist who was, at the time, the director of the heart valve program at Northwestern. But you had no surgeon as an expert witness, did you? I did not have a surgeon as an expert witness on the issue, on the informed consent issue. This was an informed consent issue. Well, on any issue you had no surgeon. No, but the case law. Any issue. This witness was clearly qualified. The question here on count three is whether there was a question of fact. And as to count three, there was a fact question as to proximate cause, and we defeated summary judgment at the Northwestern Memorial Hospital. The same causation issue existed as to the Northwestern defendants. The court found there was a fact question on causation on informed consent, which embodied the rank. So we met the causation standard on summary judgment. And the standard is simply, is there a question of fact as to proximate cause? And case law universally says proximate cause is a question of fact for the jury, and that's a standard we ask to be applied as to count three summary judgment. Can I ask a question? Getting back to the forms. Yes. So the fact that your client agreed to be part of the study, does that in any manner, shape, or form have an impact on the forms that were introduced? Your Honor, no one who received this ring agreed to be part of Dr. McCarthy's study. They weren't told about the study. They weren't informed about it. They weren't informed that this was an investigational device. They weren't informed that it was in development. There was extensive evidence that this ring was in development during the entire period of time. They were testing it. Well, there was contrary testimony to that as well. You're saying that's the only testimony, but there was actually contrary testimony. Well, not that it was in development. But that it was investigatory. Dr. McCarthy was performing these surgeries. He was doing reports on his clinical data. He was sending them back to Edwards. There were changes made in particular, changes made as to the intended use of the ring. And if I can get back to one of the main issues here is, you know, Edwards claims that it had to write, just to touch on it briefly, in order to bring a device to market, what they claim they could do is use this process called 510K, where they just say that we tweaked another device, and all we did was tweak it so we could send it out. Well, they didn't send in a 510K application to the FDA. They never told the FDA that they were marketing this ring. Instead, they internally self-certified it. And the JTF standards clearly say that a manufacturer cannot use that process in this circumstance. This ring had new, unique features. I want to go back to the FDA. Wouldn't someone from the FDA would have been easily available to actually testify to what you're suggesting? These are regulations. We had the papers. We had the standards. We had the hardcore regulations. And we also had Dr. Barkalow, who was a biomedical engineer, cover that. We also deposed Edwards' expert, Michael Billig, who was an expert. Sure, but didn't the jury reject this theory? No. No? Okay. No, they didn't hear it as to Edwards. I mean, that's the point. No, I know they didn't hear it as to Edwards, but you're saying they didn't hear it as to anyone. Well, that's not – I didn't say they didn't hear it as to Edwards. Oh, they heard it to McCarthy. They heard this evidence as to McCarthy, and the jury found in favor of Dr. McCarthy. Okay. But they did not hear it as to Edwards, and they did not hear it as to Northwestern Memorial Hospital. And I would remind you that this touches on – Okay, so then is your agency theory still at play or not? It's still in – I – You're saying they heard it as to McCarthy, they rejected it, but then you're going to stick with the agency as well? I believe he can be – that Count 5 should proceed. Yes, that's – Okay. Well, then if he is the agent, then didn't they reject it as to the principal too? I don't believe they did. They never rejected it as to the principal. Those experts then are the ones who advise the principal. We're talking about the principal's own conduct. Okay, so that's it. I mean, I've put forth the case laws on this estoppel theory, and I think it's clear that you can't – they're essentially asking for res judicata is what they're asking for, a component of res judicata, and you can't get a verdict against party A and apply it to party B. What does estoppel by verdict mean? And why are there cases that say that if the party that is presented against the full theory and the defense is presented and a jury's rejected it, it wouldn't be rejected against anybody else that was the principal? Because there's different issues. Okay. I mean, there are different issues. I mean, without overly simplifying, but if four people are in a car accident and one runs a stop sign and two runs a stop sign and three runs a stop sign, the fact that the jury finds A not guilty says nothing about whether B, C, or D's conduct caused or contributed to the ultimate outcome. There are different situations. There are different issues, and they're a completely different analysis, and it's apples and oranges, and they're different cases, and there is no identity of issue. The issue here is did Edwards do something to proximately cause the result, not whether Dr. McCarthy did something, at least as to count three. So I'd like to. Well, the problem is that if the jury has already resolved the question of the ring in that it didn't cause the problem, you know, this is a consideration that is out there. Is there anything done by a trier of bail? The jury did not absolve any of the other defendants. The jury absolved one defendant on causation, only Dr. McCarthy. They didn't hear, in fact, Dr. McCarthy actually. Well, what the jury is saying is that Dr. McCarthy didn't do anything wrong. The jury said that. The ring was not something that caused the problem. You're saying that this is, you know, this ring is something where they should have given admonishments and should have been part of an informed consent and a lot of other things when there's no proof that this ring is the cause of anything? Well, the jury didn't hear some of the real significant evidence of Edwards' misconduct and Edwards' role in this and the hospital's misconduct and the hospital's role in it. We couldn't bring that because those weren't part of the case. I mean, we fled these and they were dismissed, so the jury essentially heard a small part of the case and the jury never heard what the manufacturer said. So your argument is if the jury would have heard that, the whole result may have been different. The whole result would have been different had the jury heard everything, yes, and certainly they would have had an abundance of other evidence to mull over and consider, including the misconduct of the manufacturer and the hospital. So, you know, to put it in one sentence, you didn't get to tell your whole side of the story. I did not get to tell my whole side of the story, Judge, and it really hurt not only that but I would like to touch on here just briefly in terms of Edwards' preemption defense. I mean, this was amply briefed and I don't want to spend too much time on it, but I would just simply say that it comes down to this. We're a device manufacturer, does what it's supposed to do, sends in the paperwork to the FDA and gets FDA clearance or approval. The FDA is awarded with preemption and they can't be sued for matters that the FDA approves. In this case, we don't have that. We have a manufacturer that did not comply with the FDA requirements and never even told the FDA. The FDA did not know this device existed. So if a manufacturer fails to take advantage or fails to follow the basic steps of the FDA, it can't then come in in court and claim that it's entitled to preemption or the benefits of the immunities that are provided by the FDA. The FDA can't do anything to protect people if they don't know the device exists. So I think that fundamentally eliminates those defenses. I would like to touch on the prejudices, the prejudicial testimony that occurred at trial and particularly the cross-examination of Dr. Rajaman and the key witness. And this was very, very harmful to the plaintiff. It was very harmful to the plaintiff. Allowing the defense to get into her employment dispute with Northwestern, her media complaints, her involvement as a witness with the government. Well, let's just touch on that briefly. All right. One of the defendants was Northwestern. I'm not going to be specific as to their actual titles. Okay? Now, this woman worked for that entity at some point, didn't she? Yes. All right. And apparently she was suspended for some reason, correct? For some reason. All right. But the fact of the matter is that are you saying that a jury shouldn't have been made aware of any bias, prejudice, or interest a party may have? I mean, it's kind of basic cross, isn't it? I'm saying not in this case. I'm saying it's not as a matter of law. This category of testimony is not bias. You're saying that under no circumstances could any reasonable person ever conclude there might be a little bias going on? And she said she was thrilled or it was great that she got suspended. But, I mean, are you saying that this could never be interpreted by a fact finder as a possible bias, motive, or interest the witness may have? That is what I'm saying. All right. That is what I'm saying, Your Honor. And I'm saying it. And we're reviewing that call the trial judge made for an abuse of discretion. The most deferential standard of review. And that is what I'm saying. All right. What should the court have allowed? Are you saying there shouldn't have been any testimony regarding her employment or previous employment with one of the defendants in the case? I'm saying that none of her employment disputes with Northwestern should have been allowed into evidence. I'm saying her involvement with the media should not have been allowed. I'm saying her involvement with the government should not have been allowed. And the Quinten lawsuit should not have been allowed. And I'm saying that because bias is a specific thing. It has a legal meaning. And it means that a person is motivated to testify falsely because of some bias. What false testimony? Are you saying that the proponent has to show falsity? No. I'm saying the definition of bias is that a witness's testimony is slanted one way and that if the quote-unquote bias circumstance is eliminated, then they would have testified differently. That's what bias is. And this doesn't qualify as that. She was consistent from day one. She testified consistently the first day she made this complaint. What case could you cite that says what you are saying? I mean, for generations before you and me were even born, people who our rules of evidence always allow people to show any bias. And bias doesn't necessarily mean that they're testifying falsely. It means that they have a relationship to somebody. I beg to differ, Your Honor. The definition, the very definition of bias is that some factor makes a witness, gives a tendency to a witness to testify in a way. And their testimony would change. Would make that determination. Would change. Would change. In fact, after they hear what the bias evidence is. But courts are the gatekeepers. And where we have testimony, the trial court, I mean, the trial court used words like, in its statement, in its ruling, animosity, crusade. How can you say someone wouldn't have a little animus if they were suspended from their position with a company or, you know, a medical facility or hospital? I mean, how can you say that a fact finder shouldn't even be allowed to hear that? Because bias isn't just a question about whether animosity exists. Are you mad at the person? That in itself isn't bias. Bias is. Any interest. It's not just bias. Bias is an emotion. It's any bias, any prejudice, any interest a witness may have. But bias is an emotion that affects testimony. It has to be drawn into testimony. Otherwise. Counsel, excuse me. A reasonable person, though, could conclude there might be a little interest here against Northwestern. But the rules of evidence require courts. They require courts to recognize where certain types of evidence are so outrageously prejudicial that what nominal value they have outweighs. Okay, so that's a different argument. Your argument is really different. Now you're arguing that the court improperly weighted, and because of these horrible sort of things that went on between the witness and one of the defendants, that the prejudicial impact outweighed, it so outweighed the relevance of this or this interest the person had. Which is part of the relevance calculation. All right, so we know your position on that. You have to move along because you've got a lot of issues, and, you know, you're going to have to cover the ones you find most important. Okay. Your Honor, we touched on the brief pleadings issues. I think I'll just stand on the briefs on those. I'm not trying to cut you off. I was just trying to move you to other issues if you wanted to talk about them. So don't feel I'm cutting you off. Your time is not gone. Okay. I would just like to say I did cite cases on the by a standard Collins Affirmative Coleman case, which took isolated parts, which took one adverse employment action, one piece of evidence of employment action and found that prejudicial. One traffic court conviction found that prejudicial. One lawsuit. We have read the problems. Yes. I understand what your position is now on the file. Your Honor, he asked me about case law supporting this. We had this whole cumulative effect that painted this doctor as a scorned woman. That's what it did. It eliminated the work she did and the hype that she had. They pushed the envelope too far. They pushed the envelope too far, and it impacted the whole case. And that's clear in the trial judge's opinion. The impact this evidence had was overwhelming. It eliminated any opportunity my clan had for a fair trial and required us to try Dr. Rajamanan's employment dispute. I couldn't come back. There was no way I could come back and open the door and try to rebut any of that. It would have turned into a week-long trial on Dr. Rajamanan's employment issues with Northwestern. So they got to create all these impressions. You know, she went here. Well, why didn't something happen there? She went to the media. She went to the United States Senate. Why didn't something happen there? These are all trials in and of themselves, and they left the impression with the jury that, well, certainly something would have been done. How come we didn't hear that something was done or not? Well, I couldn't get into that. I mean, it left me with no choice but to, you know, the issues in my client's case were not, had nothing to do with that, and it just set up a side show. But did you have any contrary evidence from the FDA to really establish from this governmental agency that all these things that should have occurred didn't occur, besides, you know, this doctor's testimony or the other doctor's testimony? Was that something that could have been available? In the summary judgment proceeding, after this case, Edwards submitted a 510K application for the model 5100 mixo ring, and it was rejected because the mixo ring was etiology specific, intended purely for myxomatous disease, and if a new ring is a disease-specific ring, you can't use the 510K process. You certainly can't use the internal, what they call the JTF, where their clerks get together, their people get together in a room and decide we're not going to tell the FDA about it. It's a subset of 510K. But you can't even use 510K where it's a new etiology-specific ring, and nobody disputes that this was a new etiology-specific. There was no other device they could tie it to. Could I just direct you to this other question? As far as the informed consent and the battery, do you agree that the jury rejected that at least as to the doctor and the hospital? There was a verdict, yes, for Dr. McCarthy. The hospital's only involvement in the trial was on responding at Superior, so they never heard the evidence of the hospital's role or what duty the hospital had, and certainly the hospital had duties. They had policies to get involved in, and one of the things I pointed out in the brief was Dr. McCarthy spontaneously said on the witness stand, well, you know, I would have been fired if I wasn't right. Well, we never got to put that case up. We never got to put the case on the hospital's role, the hospital's duty, because the direct institutional informed consent came in if the hospital was taken away from us on pleadings. Well, there's case law to support that, isn't there? Didn't the judge indicate that? No, there's no case law supporting. I'm sorry? There's case law? Well, didn't the judge reject that and actually dismiss it? Okay, earlier, back in 06, on the pleadings, we cited the CUS case, and I believe the court limited the CUS case to its specific device, that battery claims and informed consent claims only lie against hospitals where medical devices are involved if we're dealing with an intraocular lens, and no case is limited. Well, there's the general rule that a hospital generally has no duty to obtain informed consent from a patient, and then there's the exceptions, and you relied on CUS for that. We relied on CUS and the hospital policies, and Edwards had policies, so, you know, certainly there's case law that extends these duties to a product manufacturer and to the hospital under circumstances, and on the battery claim and the informed consent claim against the hospital, they're pleadings questions. So the only question there is did we state a cause of action? You know, applying all inferences in favor of my client. And these were very well planned. I mean, these were extensively planned. All the elements and then some were put in there on the pleadings counts. So, you know, the case where the hospital policy part of what you put in as the response to the summary judgment. The hospital policies, the informed consent claim against the hospital didn't go to summary judgment because the hospital's informed consent and battery claims were dismissed on the pleadings. So the only ‑‑ It's somewhere in the record though. Yes. The hospital policy. Yeah, it's part of, it's actually part of, it's part of what we call the IRB handbook, the Institutional Review Board handbook, and I'm referring particularly to the excerpts at the end. There's a late 2007 section on it that really covers this extensively and in great detail where the hospital adopts the FDA regulations, the HHS regulations, and that any studies conducted under the hospital's policy are, have to follow those regulations. Mr. Breuer, if you don't have anything further at this time, we'll call on the others and we'll give you some time to rebuttal. All right? Sure. Good morning again. I'm David Jensen. I represent Edwards. I'll be going first. Mr. Parsons and I have agreed to split the time. This is, of course, indisputably a non‑defective product. Council has told us multiple times, including seven times in the two days of hearings before Judge Gomulinsky, that this is not a product liability case and there is no product defect. As a result ‑‑ There were two judges, the jury trial was ‑‑ That's right. That was Judge McGinn. Judge Gomulinsky handled the summary judgment matters on the 16th of January and the 27th of January in 2016. It was he who granted the summary judgment on all three counts, one, two, and three, that were made against Edwards. But the critical thing here is that council is not asserting that this device is defective in any way. None. What about the issue that ‑‑ I'm sorry. What about the issue that Edwards is registered with the FDA, but yet the FDA didn't know about the product? Well, that is what we've maintained was the preemption issue, and that was his count three. If you look at his complaint, you will see that count three incorporates allegations of the first ten pleading paragraphs in count one. Every one of them depends upon supposed violations of the medical device amendment of 1976. And his claim for relief is based not about the unreasonable safety of the device, but rather how it reached the marketplace. So his claim is founded about how the device got here, whether it was proper to use a justification to file, which is based upon an FDA guidance document, which was utilized by Edwards in order to make the determination as to whether or not this particular ring, the model 5100, could be put into the stream of commerce as a result of compliance with the decision tree that is included in that device. Now, that is preeminently a regulatory sort of matter, because it is up to the FDA to conduct enforcement, and it is exclusive with regard to the U.S. His whole claim was based upon the notion that you somehow or another violated FDA regulations with regard to how the device got from Edwards and its manufacturer to Northwestern. And we maintain that under Buckman, and also with regard to Martin v. Orthopharmaceutical, there is no private cause of action for that type of violation. And if you read the complaint, if you read his brief, particularly pages 43 through 46 and 47, you will see that it is nothing but a discussion of why the FDA and its regulations are implicated here. That is, he claims that Edwards misread and misinterpreted the decision tree in the guidance document. That is preeminently a matter for the regulator to consider. He maintains that Edwards should not have proceeded by the JTF, as we call it, but should have proceeded with regard to either a 510K or an investigational device exemption. That, again, implicates and is based upon the FDA, because it is the FDA that creates these by regulation, and it is the FDA that makes decisions with regard to whether or not there's been violations. And pursuant to the statute, 21 U.S.C. 1337, it is the FDA that decides whether or not there's been a violation and whether there should be an enforcement action was taken with regard to this. The evidence here was undisputed. There was no product recall ordered by the FDA. The FDA and the manufacturer met, and the manufacturer submitted a 510K in October of 2008, which resulted in a 510K clearance in April of 2009. And it's critical that this is not an investigative device. This is a device which is the surgery. Surgery was in November of 2006. It gets to Northwestern under the JTF. But so it was pre the clearance. It was pre-clearance by the FDA. That was the sole action that was taken by the FDA with regard to the release of the device. Now, the device is substantially equivalent to prior devices, so it doesn't require an extensive FDA proceeding such as with a premarket approval. It is like many other rings with modifications. That's the reason the substantial equivalency test was met. That's the reason the FDA said it was substantially equivalent. And, frankly, that's the reason the company used the JTF in order to make the decision, because the JTF is a species of the 510K. This was all laid out below. Does your client have any duty here at all? Not based upon the FDA, and the duty that the plaintiff alleges arises solely out of the FDA, the CA, which doesn't create a duty. If this had been a products liability case, Your Honor, if there had been an unreasonable risk of harm that had been created that resulted in personal injury, of course we'd have a duty. Yeah, if you had notice and knowledge. That's right. But in this particular case, everybody agrees that this is a non-defective device. And that's what Judge McGinn kind of repeated over and over again. That's correct. That's correct. So it is a very unique set of circumstances, probably not likely to be repeated, in which someone is saying, even though the device that I am suing about is non-defective, and even though the device I'm suing about resulted in the complete eradication of the condition for which my client was going to be treated, namely mitral valve regurgitation, which is untreated, progressive, and ultimately fatal. It's been eradicated. That's what the ring was designed to provide treatment for, and that's why the ring was used. And the ring was used by its inventor. Dr. McCarthy invented the ring and assigned it to Edwards in order to engineer and to manufacture. So the typical things that we think about in a products liability case simply do not exist here. But what we do know is that everything about this case is based not on traditional tort theories, as against Edwards, but comes solely out of the FDCA. And that's what Buckman versus the Buckman case talks about by the Supreme Court, because we no longer have a traditional tort here. But when you read the counsel's third amended complaint, count three, when you read his brief at 43 through 46, it is based solely on purported violation of the FDCA. And we go back to Martin, the 1996 Supreme Court case, where Justice Heupel says you cannot, we will not infer a private right of action when what you're suing for is the violation of federal regulation. Now, quite apart from all of that, we also have the issue of the fact that this was all resolved by the jury. This was a properly instructed jury. No one in this case is contending that the jury wasn't properly instructed. And so the jury in this case was instructed, because there was evidence induced, that this was an investigative, was this an investigative medical device being used on the patient? And if that's the case, a physician must obtain the patient's informed consent. And as to a human research study, if the patient is to be part of such a human research study, there are disclosures which have to be made. And the jury was instructed with regard to that, and the jury found in favor of the defendants with regard to that. This was litigated extensively. Dr. Barcolow testified with regard to this. Representatives from Edwards, now no longer in the case as a defendant, came and testified with regard to the fact that this was not an investigatory device, that this was a substantially equivalent device, and this was not a matter in which the company had ignored the applicable guidance documents and the regulations. From the company's standpoint, it had put the device into the stream of commerce in accordance with the FDA. The counsel's case in this was his to dispute with regard to whether or not we had complied with the FDA. That was his case, and Judge Gomelinsky understood that that is a case that's preempted, because the only thing that is involved is an interpretation of whether or not there's been compliance with the regulations. His whole claim for relief was created with regard to that, and that is the type and kind of case that is preempted with regard to Buckman. The court further instructed the jury that a well-qualified physician has to disclose a human research study, or that he's a physician investigator. And, again, the jury rejected that particular contention, and that the jury was also instructed that Dr. McCarthy, if he had used an investigational medical device and failed to perform the plaintiff, then he could have been held for having violated a duty. But the jury found against the plaintiff on all of those, and on the basis of a stop or buy verdict, we maintain we're entitled at this stage to take advantage of that, because, of course, that was an issue which we should be able to say you've tried it and you've lost it. That's the nature of a stopper. You are stopped when you have an earlier day in court to present the evidence, and you can't keep going just because there's more available defendants. Now, quite apart from the issue of preemption, counsel says that preemption doesn't apply here, and the reason for it is the FDA didn't know that the device had been put into the stream of commerce, and, therefore, preemption doesn't apply. You didn't comply with the FDA regulations. But, of course, Buckman is a fraud on the FDA. The claim there is in the MDL with regard to these devices, the claim was, you know what, you defrauded the FDA. They never really had even a chance to review your device. Very similar to counsel's argument here. The MDL court dismissed the allegations against the manufacturer of the orthopedic device and the representative who had been responsible for getting it through the FDA process. The case then goes to the United States Supreme Court, and the court says, no, that's not a traditional tort, just like this isn't a traditional tort. If you're going to pursue that, you have to pursue it at the FDA, because we want uniformity of enforcement. And the problem, the fundamental problem with the type of issue we have here is, with the non-defective devices, is to have Illinois or Indiana or Wisconsin have different jury determinations about how a device that's regulated by the FDA should ultimately get to the consumer when there's nothing the matter with the device. It is that lack of uniformity that would destroy what the FDA is all about. And so that's the reason we have the preemption. Now, with regard to the two counts in which there were dismissals before the summary judgment several years ago, the first one is the agency account, that is that Dr. McCarthy was our agent. He's won. And a determination in favor of either the master or the servant with regard to allegations involving them serves as res judicata, but perhaps it could be collateral estoppel, with regard to the other one. So we maintain we're entitled to rely upon that determination for Dr. McCarthy, and we take advantage of it. Yes, and I'm summing up right now. The final contention is that somehow or another there was a lack of consent. Consent, of course, in this state is directed through the learned intermediary, and in this particular case, there was more than adequate consent, and again, the jury in this case rejected the informed consent.  Parsons. Parsons. No S. Thank you. Usually that's not noticed. Because my time is brief, if it pleases the Court, I'd like to address some questions that were raised during appellant counsel's remarks that I have the answer to. Nobody in this case testified that it was more probably true than not true that there was something peculiar about this ring, as opposed to other rings that were on the market, that caused an injury to this patient. There, a sensible expert, Dr. Rajamanan, who is a biologist, who is not a surgeon, and has never performed surgery, testified that, at one point, that it was definitely sutures that caused the injury to his circumflex artery, which caused it to narrow, leading to a myocardial infarction. The narrowing of the circumflex is really the injury that allegedly leads to the MI. All of the surgical experts in the case testified that the sutures are placed without regard to what ring is used. They're placed the same way, and they all said that what ring was used would not impact the placement of the sutures. Therefore, the way the sutures were placed could not be associated with this ring. And Dr. Rajamanan acknowledged that that was a potential cause of the narrowing of the circumflex. At trial, at the 11th hour, she came up with another theory, that there was something odd about the shape of this ring, as compared to other rings on the market, that she felt caused pressure on the circumflex artery, which comes in around the valve, if you picture the valve to be a circle. It's not a circle, but picture it as a circle. And the circumflex artery comes close to the valve at 6 o'clock, along the border of the valve, and follows up around from 7 o'clock, 8 o'clock, 9 o'clock, and then exits the area. She theorized that there was something about the ring that put pressure at the bottom of the valve, at the 6 o'clock mark. The evidence in this case showed, the only evidence in this case, showed that the narrowing was not at 6 o'clock, it was at 8 o'clock. And more significant is the fact that Dr. Rajamanan never testified that it is more probably true than not true, that the shape of the ring was what caused the narrowing of the circumflex. Her testimony was, it was a suture, or the shape of the ring. Not that one is more probably true than the other. There's no leaning towards one versus the other. And the law with respect to proximate cause I submit is clear, that when possibilities are equally balanced, plaintiff has failed to meet their burden with respect to causation. The other issue that I would like to raise, which permeates a lot of the issues in plaintiff's appeal, is the idea that we have discussed at length, is estoppel by verdict. There's been discussion that plaintiff appellant did not get the chance to present a case against Northwestern Memorial Hospital on informed consent. I won't go into detail about what the laws of informed consent as it applies to an institution. Your honors have acknowledged that the general rule is pretty clear that the physician is responsible for that. There are two appellate cases that set up an exception. And those exceptions are very narrow. And those exceptions are stated in terms of being limited to the facts of those cases. And both of those cases involve situations where a hospital had an acknowledged FDA study that was proceeding at the hospital. That is not the case in this lawsuit. The complaint is that Dr. McCarthy did not submit the case to the IRB for, I'm sorry, did not submit the implantation of the Mix-O-Ring to the IRB to allow him, to give him permission to use the Mix-O-Ring in patients. And number two, in those specific cases, there were specifically prescribed consent forms that the hospital agreed to use and agreed to ensure that the physician would use. Well, there was no IRB in this case, so there was no FDA prescribed consent form. And so there was nothing, there was no affirmative undertaking according to the evidence that plaintiff presented to ensure that a certain consent form was used. Your honors asked whether the jury determined that this was not an investigational device. Counsel just read for you the verdict form. They found in favor of the defendants on that. The defendants being Northwestern Memorial Hospital and Dr. Patrick McCarthy. They were asked whether this was a human research study. And the verdict was in favor of the defendants, from which we presume they concluded no, it was not. Again, an account that had, that was levied against both Dr. Patrick McCarthy and Dr. Patrick McCarthy. And Northwestern Memorial Hospital. If plaintiff wanted to try to bring an institutional informed consent claim against Northwestern Memorial Hospital after this whole trial has been held, this three-week trial, the evidence would center on the precise same issues. Was this an investigational device? Was this a human research study? The hospital's policies and procedures were in evidence at trial. Actually, Northwestern University's policies and procedures were also in evidence at trial, and they were not a part of the case. But we have for purposes of estoppel by verdict, identity of issues, we have identity of parties in Northwestern Memorial Hospital. And for that reason, plaintiff cannot be permitted to have a second bite of the apple and litigate the precise same issues that were litigated in the underlying litigation. Plaintiff's counsel has alluded to there being no, he was not allowed to put on evidence of hospital misconduct. After years of discovery in this case, I'm not sure what he's alluding to. There was ample opportunity for plaintiff's counsel to develop the evidence that he needed to develop to bring his institutional informed consent claims within the scope of the case law that permits him to bring those claims. And he did not. He did not present evidence at trial regarding those issues. He did not attempt to amend his pleadings to conform to evidence before trial to resurrect that issue. And that's simply because the evidence to support those claims wasn't there. Irrespective of what he alleged in his original third amended complaint about the basis for an informed consent claim against the hospital or a battery claim against the hospital, the evidence that was adduced during discovery and the evidence that was presented at trial demonstrated that there is no basis for such a claim against Northwestern Memorial Hospital. Switching gears, I'd like to address this bias issue, which I find to be confounding. We presented evidence that Dr. Rajamanan, again, they're a sensible expert, was dismissed from Northwestern Memorial Hospital. And NMFF, because it showed bias. Contrary to what plaintiff's counsel says, the case law recognizes that bias relates to hostility, prejudice, ill will. I submit to your honors that the reason that bias is important is not necessarily because it means somebody is lying, although it could mean they're lying because they have an ax to grind against somebody. But I believe it's also human experience that bias causes us to have a lack of objectivity. The Supreme Court in this state has cautioned that counsel must be given the widest possible latitude during cross-examination of experts to demonstrate any interest, bias, or motive of the expert witness to testify. Counsel has suggested that his beef is that we overdid it. I'm not sure in light of the decision in Trower v. Jones, which I just quoted, that we could overdo it. But I will suggest to the court this. When we presented evidence that Dr. Rajamanan was dismissed from Northwestern Memorial Hospital and NMFF, we were only allowed to introduce the fact that she was dismissed. Not why. Not that we had a good reason to do it. And believe me, we had the evidence assembled, but the trial judge concluded he was not going to allow this to become a mini-trial on why she got fired. But he agreed that it was relevant to us to say she was dismissed because, as your honors have observed, common sense tells us that when somebody fires you, there can be hard feelings. Again, we were not allowed to say why. And I submit to your honors, that is a double-edged sword for us because Dr. Rajamanan's position is, yes, I was fired because I told people what was going on, that there was human behavior, but it was a calculated risk on our part because a jury could just as easily conclude that she was fired for the reasons that she said as for the reasons which we weren't allowed to present to her. You need to wrap it up, too. All right. As counsel have already observed, much of the issues are addressed in our briefs. And if your honors do not have any other questions for me, I can conclude my remarks. All right. Thank you, Mr. Carson. All right. Mr. Boyer, brief your call. And I mean brief. As to Edward's comments on the Estoppel issue, I will add one more point. They did not, Edward's has not identified issues, specific issues, as to which Estoppel applies, nor has Edward cited a single case that stands for the proposition that they seek to apply here. We responded in our reply brief to every case they cited, none of which apply here, none of which say a verdict against A applies Estoppel to a verdict against B, C, or D on all things. Secondly, the guidance paper that they rely on for the, for using this as a basis for their case, the guidance paper that they rely on, behind the scenes process, specifically says that it cannot be used if the device has a different intended use. This device, nor was this device, was it substantially equivalent to anything. The evidence showed there was a patent filed that claimed 40 unique differences from other devices. It was larger than other devices, it was three dimensional, and it was specific to an etiology. All of that is new and different from any other device that had ever been on the market. They talked about, Edward's talked about the fact that we did not claim a defect, and it was Judge Gomelinsky in the summary judgment hearing that relied on that. We did not bring a strict products liability defect claim. We, against Edward's, we never claimed there was a product defect. We brought a failure to instruct or warn based on Hansen, that a manufacturer has a duty to give warnings to those downstream, so they can warn others. It's reliance on Martin does not apply here. Martin was the predecessor to Hansen, and Martin, in Martin there was generalized knowledge, and they said there was no duty of a product manufacturer to inform of matters that are known generally. That was later, Hansen came along later and carved out an exception to that, which is that, which said that manufacturers have a duty to inform those downstream, the hospitals, et cetera, where they have specialized knowledge, where they have unique knowledge, and we have that here more than any other. The unopposed testimony of the summary judgment state, Dr. McCarthy and his nurse will say this, that they rely on the manufacturer to label devices and to give them information that these are investigational devices or like, and if they had done that in this instance, it would have been a completely, the nurse said it would have been, everything would have been different. They would have given patients information, they would have told them, they would have complied with informed consent, so that was the evidence. Buckman, I've distinguished Buckman, I think, in the case law, but Buckman was a fraud on the courts, on the FDA case. It was not an informed consent case, so we don't have that here. Moving on to Northwestern. All of the opinions offered at the summary judgment stage in a trial by our witnesses were based on a reasonable degree of medical certainty. The qualifications of the testimonies were based on a reasonable degree of medical certainty. The evidence and competency of Dr. Rashomon to express her opinions was specifically challenged. There was a summary judgment hearing on it. There was a hearing on it at the summary judgment stage. There was a hearing on it at trial. The courts went through ample evidence and found that she was uniquely qualified, amply qualified. I think I spent four hours qualifying her in her different fields with her extensive CV knowledge, not only of the valve, but of this ring, where she was a co-author. She worked with Dr. Rashomon as well as any doctor in the universe except maybe Dr. McCarthy. And she was uniquely qualified to comment on it and how it fit and worked in the heart valve. That was her expertise. And she actually did studies that were part of the initial paper. And her opinions were accepted and they were valid. The issue about sutures versus the ring and what was the cause, our summary judgment briefs for those, I don't have the sites off the top of my head, but had pages of citations in the record on proximate cause and how proximate cause was established. And we prevailed on proximate cause on the summary judgment stage, at least as the Northwestern. The court accepted that there was a fair question. And there was extensive testimony offered on that. Mr. Carson mentioned that we didn't present evidence against Northwestern at trial. Well, the claim against, the institutional claim against Northwestern was dismissed in 2010. We never developed a record against Northwestern. There was the institutional informed consent claim that dismissed early on in the case. So we didn't develop, it wasn't my fault for not putting evidence together or the plaintiff's fault for not putting evidence together and not putting evidence together. Lastly, on the question of bias, I would ask this court to consider. The bias is not subjective. It's not just what we feel or what we think. There has to be some kind of objective standard applied to it. The law requires that. And it's not just if someone's upset or they're angry. I cited the cases that talk about how it must impact the testimony. And there was nothing that was consistent from day one. None of the stuff that they brought in about her in any way impacted the testimony. They never made that claim. They never made that point. They brought in this evidence for one purpose. And that was to make her look like she was being emotional. And I think the time for that is over. I think courts need to step up and not tolerate that. The time for that is done. And I'm asking this court to be a gatekeeper, to recognize it, and draw a line there. It ruined my client's territorial innocence. Thank you.